May it please the Court, I'm Betsy Stevens for the appellant Randall Lubin and this case has quite a number of issues. With the court's permission I'd just like to address a couple of them and rely on the briefs for the majority of the others ALJ found it at step 2 that Mr. Lubin has a severe mental impairment and found that the mental impairment causes moderate limitations in social functioning and moderate limitations in his concentration persistence and pace however the RFC finding that the ALJ gave at step 4 did not include any the moderate limitation in concentration persistence and pace it arguably did address the social functioning by restricting him to no contact with the general public but it did not address his ability to maintain concentration persistence and pace and Social Security ruling 8515 tells us that the ALJ should not assume that just because a claimant's mental impairment does not meet a listing that they're capable of performing unskilled work because unskilled work encompasses a couple of different levels of work and what the ALJ needs to do in the RFC is come up with some specific mental limitations more itemized limitations your honor in my opinion it was not and not only because of the concentration persistence and pace but also because the ALJ improperly rejected a number of the medical opinions the opinion of the claimants treating dr. dr. Mecklin and the examining psychologist dr. Shields and also the lay witness testimony from the claimants wife exactly what should have been in that vocational hypothetical well your honor under under the rulings under 8516 a severe impairment a severe mental impairment by definition causes a significant restriction in the ability to perform basic work activities and those activities include things like responding appropriately to supervision and criticism from supervisors and responding appropriately to changes in a routine work setting and the lay witness testimony from the claimants wife establishes that the claimant has a substantial loss in it at least two of those basic mental work activities and I don't know if you had the opportunity to review this particular part of the agitated by the ALJ's questioning and had a mental meltdown basically and had to go off the record and started yelling at the judge and his wife wrote in a letter after the hearing that this is sort of a typical thing that he does when he's under any kind of mental pressure or stress and she actually apologized for his behavior because and noted that she has to live with it and she knows how awful he can be when he's stressed so I'd like to rely on the brief for the other arguments but in short the ALJ improperly rejected the lay witness testimony from the wife the opinion of the claimants treating physician dr. Meckling the opinion of the examining psychologist dr. Shields and there's also evidence in the record that the claimant may or may not be able to read his treating physician doesn't think that he can read and he had a head injury when he was a child and he may be dyslexic and we don't believe that the ALJ properly developed that aspect of the record and also the examining psychologist thought that he needed a neurological workup in case there was brain damage from his childhood accident so because the RFC finding didn't include all of the claimants limitations the vocational or the hypothetical didn't include the limitations the vocational experts testimony has no evidentiary value if all of the limitations are not included in the hypothetical and and so it's harmful error all of these errors all these individual errors are harmful errors because had those limitations all been included in the vocational hypothetical then then the vocational expert may have had a different answer as to whether or not the claimant could perform work at step 5. All right. Okay, thank you. Good morning, your honors. Again, good morning to the clerks for the second time today but also good morning to counsel once again. Brett Ekelberg on behalf of Michael J. Astrew, Commissioner of Social Security. Commissioner is here again to ask the court to affirm the administrative law judge's decision in the Lubin case as it is supported by substantial evidence. Question that came to the forefront is were the limitations properly accounted for in the ALJ's residual functional capacity finding? Did the ALJ construct and formulate an RFC that took into account the credible limitations? And the Commissioner would stress that in this particular case where credibility is such a central factor that it should look at and consider the Bayless case where the holding was that the ALJ's RFC finding and vocational hypothetical, it's proper when it takes into account those limitations for which there was record support that did not depend on the claimant's subjective complaints that lacked credibility. In this particular case, if we focus on, say, the issue of concentration, to what degree could Mr. Lubin concentrate? And did the ALJ properly account for concentration in the RFC? In the record, there's testimony by both Mr. Lubin and his wife that his concentration was affected by pain. Pain was what triggered problems with his concentration. And to the degree that pain is coming from his alleged physical impairments, his lower back injury, his left ankle injury, to the degree that those are not credible complaints, that draws into question the credibility of the amount to which his concentration is also impaired. However, if we look at the ALJ's RFC and set aside the substantial evidence which supports the adverse credibility finding about his physical impairments, you will note that the ALJ on page 51 limits Mr. Lubin to no exposure to hazards due to his use of narcotics and marijuana, and also limits Mr. Lubin to jobs involving one- to three-step tasks to accommodate this issue of his anxiety, his concentration. Those are simple jobs that the ALJ determined that Mr. Lubin could perform. What's interesting is that the reference to Mr. Lubin's ability to perform jobs involving one- to two- to three-step tasks, that comes directly from Mr. Lubin's testimony that he could indeed perform these tasks, depending, of course, on his degree of anxiety, he said. And this was in the record that I can perform one- to two- to three-step tasks because I can ride a motorcycle. The ALJ was asking, well, what are the implications of your ability during the time that you were disabled, your ability to ride a motorcycle, what are the implications of that? He said, I would have the ability to perform one- to two- to three-step work tasks depending upon my anxiety. When that qualifier is put on there about anxiety, it's critical for the court to recall, as has been briefed in this particular case, the degree to which his anxiety level is directly correlated with his use of marijuana. He told Dr. Shields, for instance, that he smoked six joints a day when he went in in May 2006 for a psychological evaluation with Dr. Shields. And Dr. Shields' diagnoses are all provisional or conditional because of this influence of drug use. That... Now, do we think that he was addicted so that it would be difficult for him to discontinue the use of marijuana? No, there's not that finding in the record. He was using marijuana, he says, at one point he testified for recreational purposes. He also used it, he said, for medicinal purposes for pain, but he did say to Dr. Shields he was using it for recreational purposes. Well, that doesn't mean that he wasn't addicted. That's his excuse for his taking marijuana. So it seems to me from this record that he's probably an individual who's going to be using marijuana on the job, if he got a job. Right. And it, in fact, Your Honor, the reason why he lost his last job that's in the record was not because he couldn't perform the job, but because he was smoking marijuana. But what we see, Your Honor, is he is functional. We have any number of instances where he's functional and capable of performing work by his own admission, performing one to two to three-step work tasks, which is accounted for. And the ALJ did account for the use of narcotics and marijuana based upon Dr. Shields' report, but there is no indication in the record that he was addicted to this substance. And he used it, but in terms of being addicted, that's not within this particular record. And the ALJ properly accounted for these factors within the RFC that she constructed. The credibility, for instance, involves things such as, like I said, riding a motorcycle, and the findings of Dr. Sorwide in May of 2006. He's an examining physician, and Mr. Lubin testified when he first applied for disability benefits. He said that he could not bend over to put on his shoes and socks. He could not bend over to pick up laundry. He could only lift five pounds. And if we look at the different comparison between this testimony in April of 2006 with what he said to the ALJ at the hearing in 2009, January of 2009, where he says, I can, you know, the ALJ says, what could you have done in 2006? What were your capabilities in 2006? And the reason why the ALJ is focusing on that is, again, because of the centrality of the date last insured, which in this case is December 31st of 2006. So once 2006 expires, you're past your date last insured, by which point you need to prove you're disabled. But Mr. Lubin testifies in January of 2009 that in 2006, he could lift 40 pounds, and he could lift 40 pounds, 45 pounds maximum and frequently. And this is at pages 26 to 27 in the record. So compare at the outset where he says in 2006, when he's first applying for benefits, I can only lift five pounds, versus when he's testifying before the administrative law judge, what were your capabilities in 2006? I could lift 45 pounds maximum and 45 pounds frequently. I could sit for 30 to 45 minutes, stand for 30 to 45 minutes, stand for an hour. And he said I can do one-to-three-step tasks at page 22 to 23. So everything is taken with a grain of salt in this particular case where you have Dr. Sorowide, the examining physician, stating, not suggesting, not implying, but stating that this particular individual is, quote, clearly faking several aspects of his physical exam, end quote. And that is at page 212 in the record, and the ALJ discussed this at page 53 in her decision. Dr. Sorowide said he's fixated on his injuries, and he describes them in exaggerated and grandiose terms. He came into the exam with Dr. Sorowide shuffling, the doctor says, shuffling. He resisted examination and complained during the physical and clinical test. However, Dr. Sorowide observed this particular individual walk out of the exam room without any problem at the end of the exam, and before that, bent down, put on his socks, put on his shoes without any problem, which the doctor said was inconsistent with the allegations of disabling injuries for the degree to which it was alleged to be inconsistent. Sotomayor, what about Dr. Shields, who was a psychologist? This guy's problem seems to be more psychological than anything. Well, Dr. Shields, what he, what his diagnosis is in part, for instance, Your Honor, the question of did he have a cognitive impairment. Dr. Shields, who was a psychologist I didn't hear the first part. Back up. Pardon me. I'll repeat that. The question of the cognitive impairment or cognitive disorder came up for Dr. Shields based upon what Mr. Lubin said to him, and this is at page 216 and 217 in the excerpts of record. Dr. Shields says, he said that he was, he had a head injury, and if you look in the record, Your Honors, Mr. Lubin says he had the head injury when he was seven years old or eight years old or nine years old, depending upon which part of the record you look at. He also said he was in a coma for two months or three months, or it doesn't come up at all in some places about the coma, but he told Dr. Shields he was placed in special ed classes for the remainder of his school years after this incident happened at seven or eight or nine. However, if you look at page 137, again, where he's applying for records at the outset in April of 2006, page 137, he indicates that he was not in special education classes at the outset. So what you're seeing is Dr. Shields' opinion being influenced by inconsistent testimony. 137, I did not take special education classes. And so, again, taking that opinion with a grain of salt in these particular set of circumstances. Well, what do we know about the facts? Was he or wasn't he taken? Yeah. I mean, he could be, he could be mixed up about a lot of this stuff. That's possible, but... Well, that's what the psychiatrist, as part of his job, is to figure these things out or come up with an explanation and a diagnosis. But, I mean, this person is not in very good shape with kind of a plethora of physical and mental problems. And, Your Honor, I would point again to what the administrative law judge was looking at, which was a follow-up investigation by the Office of the Inspector General due to Dr. Sorwide's request about the degree to which this individual was faking at his exam. And the ALJ took into account these individuals' testimony that they directly observed him contrary to his testimony about being anxious, meeting new people, or being undone by that experience. They said that he had no, exhibited no anxiety, no instability. When these agents came to talk with him, he was calm. And this was the point at which, again, if you're looking at the physical issues which supposedly give rise to the concentration problems, he was telling these individuals about his motorcycle riding and building of renovating his property. And so we have any number of things where... But I'm always wondering, these fellows come in, he doesn't know who they are. He's just trying to make himself look like a macho guy. Okay. And I'll, you know, Commissioner will, you know, not argue with Your Honor about that. That's a fair interpretation. But the ALJ's interpretation also, I think, is based in evidence as well. There are two reasonable interpretations, and in that situation the Court should affirm the ALJ's interpretation. But could I give the Court perhaps like a snapshot about the... Well, how about, how about Dr. Meckling, who treated him for many years, took care of him, treating physicians? What does she have to say about this? Your Honor, I've just noted on that 44 seconds, and so I probably need about, you know... We want to explore whatever we want, so keep on answering. I also wanted to respect your time, Your Honor, so I'm happy to answer that question. We have lifetime appointments. We've got a lot of time. I guess it's Friday, so... We don't care what day it is. The weekend's going to start one way or another, Your Honor. So, okay, thank you, Your Honor. And with that, I will, let me share with you some snapshots out of the interaction between Dr. Meckling and Mr. Lubin. And these are insightful, I think, in terms of the validity and the reliability of his complaints about depression or psychological impairments. Say, for instance, if you look at the outset, at March 17th of 2006 at page 200 in the excerpts of record, Mr. Lubin comes to Dr. Meckling and says, I can no longer, quote, can no longer do hard labor and cannot get motivated to do minimum wage work. Can't get motivated to do minimum wage work at 200. Three days later, he applies for Title II disability benefits. In September of 2006, Mr. Lubin comes to Dr. Meckling and says the state has not found him fully disabled. And he says, the doctor writes in her notes, quote, he wants me to write a letter to ALSA so they can get started. He wants me to tell them that he is emotionally, mentally not able to work. At the end of that particular treatment note, at page 306 in the record, the doctor writes, you know, otherwise he's well. He and his wife are getting along just fine. So the doctor is just documenting this request to, you know, write a letter for me to say that I'm emotionally and mentally not able to work. Later on, if we go towards the end of the record, so we've gone to the beginning, the middle, and the end, if we look in July 2008, Mr. Meckling comes in and, you know, says he's had a fight with his son. He was injured with his son. It's you know. Kennedy, what page are you looking at? That's, Your Honor, that's at page 370. And it's from July of 2008. So 370. Are you looking at these records called Physical Capacities Evaluation? Well, I'm looking. Are you referring to the mental RFC findings in the context of this? What I'm looking at is a treatment note with Dr. Meckling, Your Honor. It's at page 370. And I can discuss the mental RFC findings if you would like me to. That's at page 274. And the State agency physician there said that there were no limits due to concentration, persistence, or pace at that particular point in the record at page 274. But I was referring to 370, and this is the incident where Mr. Lubin comes in, and he's had a fight with his son, and he's injured. At the same time, he reminds Dr. Meckling, I've got an upcoming disability hearing. There's not another meeting with Dr. Meckling until October 27th of 2008, when he says that he's had a fight with his son, and he's injured, when Mr. Lubin comes in to be treated for a tick bite that he got while he was out deer hunting in late October of 2008. So between this time when he comes in and says, you know, I'm severely depressed, and the commissioner would assert that on page October 15th, 2008, when Dr. Meckling writes the letter, the final letter from her in the record, where she says, I have also seen Mr. Lubin in severe suicidal depression. This is October 15th of 2008. It's the follow-up letter after Mr. Lubin came in and said, hey, I've got an upcoming hearing, and in the context of having her write letters for him, she understandably says, yeah, I've seen him in severe suicidal depression, but it's regarding this discrete incident where he had a fight with his son. And then the only other record after that that exists is the tick bite treatment while he's out deer hunting, and then after that, November 4th, 2008, spot on the nose. And the commissioner would ask the court to review, I won't go through all the page numbers, but there's healthy, substantial evidence showing the inconsistency between Dr. Melching's conclusions and statements about his mental state and what's actually going on in the treatment notes. And his Honor, Judge Aiken in this particular case, her Honor, sorry, her Honor, Judge Aiken in this particular case, did the same thing in her decision, and the commissioner would encourage you to look at those to put Dr. Melching's pronouncements into context. There's some discrete events which triggered those statements, but they're not supported by the treatment notes, which is a basis upon which an ALJ can discount a physician's opinion. And so here we are with this severe incident in July of 2008, but no follow-up whatsoever about depression or anxiety or concentration problems, just deer hunting incidents and a spot on the nose in November. And there's case law to support the fact, or regulatory law to support the fact that you or even logic, that if you're not complaining about something over that period of time, that it's a reasonable conclusion for the ALJ to make that the parents do not exist to the level that is claimed. Commissioner would also, just as opposing counsel, they'd refer the Court to the brief, which again has specific sites and specific references, but would otherwise assert that the ALJ's decision in this particular case was supported by the financial notice. What about these reports where places are checked off at 282, and it looks like they were done February 26th of 07, and they're not supported by the financial notice. Looking at 282, it tells us that during an entire 8-hour day. And, Your Honor, may I ask? The tests tell you that the patient cannot maintain body posture consistent with full-time work. And so sit, have, sit less than three hours, stand, walk less than three hours. Does the patient need opportunity to alternate sitting and standing? Yes. Fine manipulation, no, no. Patient can use hands for repetitive motion tasks, writing, typing, assembly, no. Can use feet for repetitive movements as operating foot controls, right, no, left, no, both, no. Okay. Does the patient suffer from fatigue for which there is a reasonable medical basis? No. Please describe chronic pain. Is fatigue disabling to the extent that it prevents the patient from working full-time, even in a sedentary position? Yes. The patient can carry 0 to 5 pounds occasionally, I mean, excuse me, frequently, 6 to 10 occasionally, 11 to 20, and all the way up to 51 to 100. Never climb, never balance occasionally, stoop, never kneel, never crouch, never crawl, never shoulder level, never. Yes, Your Honor. Would you like to go on? It goes on and on. Yes, Your Honor. That is actually at the end, positioned at the very end of Volume 2, I believe, of the excerpts of record. It's Dr. Shields' checkbox checklist report, which does not have the narrative-developed discussion of these impairments. Is that correct, Your Honor? Am I correct? You're looking at, it should be at the very, very back of, I think, Volume 2. Well, I've got some excerpts of those here. Okay. Well, I'm almost certain I know exactly which record you're talking about. I could go get my excerpt, but I know, I believe I know which report. This is, again, yeah, Dr. Meckling's report, yes, Your Honor. And it would be, the ALJ discounted it for the same reasons I went to. That's the treating position, right? Yes, that's correct, Your Honor. And this is the one where the ALJ looked at, looked at Dr. Meckling's, I think it's reasonable, the Commissioner would assert that it's reasonable that these are, they're unsupported, they're checklists, they're declarations. For instance, the main reason on that form in February 2000 that Dr. Meckling said this individual is disabled is very short and to the point, failed back surgery. However, the record does not support that basis and draws into question for the ALJ who reasonably looked at this explanation and says it does not support a finding of back surgery in 1998, went back to work, Dr. Koh, who was a treating urologist. Well, we know that, at least what I read in medical publications that I get some weekly, that one thing you want to avoid is back surgery because the failure rate is very high. And so when she talks about failed back surgery, that seems to have some credibility, at least in my mind. And, Your Honor, that is correct. But that's premised upon the fact that he had failed back surgery, which the record as the ALJ documented specifically, the record does not support that finding. The back surgery occurred in 1998. He had a series of x-rays and MRIs in 1999 and also in 2000. The 2000 x-rays and MRIs, for instance, showed mild results, mild findings, showed a presence of a previous surgery, but mild findings. And then the record is silent. It's silent. If I might go grab one document, Your Honor, I could give you a page number even. But the record is silent for about a year and a half in terms of treatment notes or any medical notes before Mr. Lubin applies for disability benefits. That's not correct. Before Mr. Lubin begins to see another physician about a shoulder impairment. So you have a period with no medical treatment for a year and a half. He then goes back for a shoulder complaint. But Dr. Koh, who was his treating neurologist, cleared him to go back without limit to work in August of 2004. And this is well past the failed back surgery. Despite his complaints of pain, Dr. Koh, his treating neurologist, cleared him and said he can work without limit. And so the Commissioner, again, would go back to the point of putting this, the record into context and looking at the Commissioner's citations to specific pages that show inconsistencies as well as the process. We understand your argument. We've gone through all this. Okay. This is the 13th of the month and you're over time 13 minutes. Thank you, Your Honor. Okay, thank you. Commissioner, the opportunity. No, no. You're a hard worker. Do you want to add something? Thank you, Your Honor. Your Honor, I'd just like to say that even setting aside all the credibility issues and the medical records, based on the ALJ's own findings in her decision, the evidence that she did find to be credible, she found moderate limitations in concentration, persistence, and pace, and in social functioning, and did not account for those limitations in her RFC finding. What's counsel's request of this Court to remand for further development of the record or making some other requests? That would be okay, Your Honor, but we would love if the Court would remand for payment of benefits based on the medical evidence and the lay witness testimony and the ALJ's own findings. Thank you. Thank you. All right. This concludes our five days of hearings. And we'll be back here when called again someday.
judges: Marshall, Fletcher, Pregerson